| |
|---|
| ERIC VEILLEUX<br>        Plaintiff,<br><br>        v.<br><br>PROGRESSIVE NORTHWESTERN INSURANCE<br>COMPANY, et al.<br>        Defendants. |

No. 3:16cv2116 (MPS)

## RULING ON MOTION FOR SUMMARY JUDGMENT

### I.        Introduction

This case involves an injured party's suit to collect a judgment obtained against two

tortfeasors from their insurers.  The plaintiff, Eric Veilleux, brought suit against the defendants,

Progressive Insurance Company ("Progressive") and Nautilus Insurance Company ("Nautilus"),

to collect on a stipulated judgment entered against Central Auto & Transport, LLC ("Central

Auto") and Central Rigging & Transfer, LLC ("Central Rigging").  This Court previously

approved a stipulation of dismissal with respect to the claims against Nautilus (*see* ECF No. 78;

ECF No. 76); hence, Progressive is the lone remaining defendant.  Veilleux's remaining claims

against Progressive include the following: (i) a direct action under Conn. Gen. Stat. § 38a-321

against Progressive for the full amount of a $750,000 insurance policy provided to Central Auto

(count one); (ii) a common law claim for the same amount advanced under an assignment of

rights from Central Auto to Veilleux (count two); (iii) a common law claim for the same amount

as a judgment creditor of Central Auto and/or as a third party beneficiary of the policy between

Central Auto and Progressive (count three); (iv) a claim for breach of the implied covenant of

good faith and fair dealing on the basis of Progressive's failure to honor Central Auto's policy

(count four); (v) a direct action under Conn. Gen. Stat. § 38a-321 against Progressive for the full

amount of a $1,000,000 insurance policy provided to Central Rigging (count five); (vi) a common law claim for the same amount advanced under the assignment of rights from Central Rigging to Veilleux (count six); and (vii) a claim for breach of the implied covenant of good faith and fair dealing on the basis of Progressive's failure to honor Central Rigging's policy (count seven). Now before me is Progressive's motion for summary judgment. (ECF No. 81.) For the following reasons, this motion is denied.

## II.    Background

### A.    Factual Background[1]

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated. Progressive issued a "Commercial Auto Policy . . . to Central Auto & Transport, LLC ("Central Auto"), with effective dates of June 2, 2006, to June 2, 2007" ("Policy 1"). (ECF No. 83, Defendant's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") at ¶ 1; ECF No. 87, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") at ¶ 1.) Progressive issued a "commercial Auto Policy . . . to Central Rigging & Transfer, LLC ("Central Rigging"), with effective dates of March 10, 2006 to March 10, 2007" ("Policy 2"). (Def.'s L.R. 56(a)1 Stmt. at ¶ 11; Pl.'s L.R. 56(a)2 Stmt. at ¶ 11.) At the time of Veilleux's accident, Central Rigging, Central Auto, and "Central Construction Services, LLC, each conducted business under the name of 'Central Group' as well as under each of their separate corporate names." (Def's L.R. 56(a)1 Stmt. at ¶ 21; Pl.'s L.R. 56(a)2 Stmt. at ¶ 21.) All three entities "acted in concert, in a joint venture and as a commingled, single entity in regards to

---

[1] The Court presumes the parties' familiarity with the details of the underlying case and therefore limits this factual background to those facts necessary to resolve the defendants' motion. Other facts will be discussed as necessary in the Discussion Section below.

the acts and omissions described in the plaintiff's operative complaint." (Def's L.R. 56(a)1 Stmt. at ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at ¶ 22.)

Veilleux "alleges that on September 8, 2006, he was employed by GDS Contracting, LLC ('GDS') in Berlin, Connecticut, and was working on GDS's premises." (Def's L.R. 56(a)1 Stmt. at ¶ 24; Pl.'s L.R. 56(a)2 Stmt. at ¶ 24.) On that day, according to Veilleux's complaint, "Joseph Cunningham was acting as the agent, servant and/or employee of Central Rigging." (Def's L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s L.R. 56(a)2 Stmt. at ¶ 25.) Cunningham allegedly "drove onto GDS'[s] premises in a tractor labeled 'Central Rigging,' pulling a trailer labeled 'Central Auto and Transport' . . . ." (Def's L.R. 56(a)1 Stmt. at ¶ 26; Pl.'s L.R. 56(a)2 Stmt. at ¶ 26.) Cunningham, who had arrived on the premises "to deliver an aerial lift," either asked or directed that Veilleux "assist him in unloading the aerial lift from the trailer." (Def's L.R. 56(a)1 Stmt. at ¶ 28 ("[Veilleux] alleges that on September 8, 2006, Joseph Cunningham asked [Veilleux] to assist [Cunningham] in unloading the aerial lift from the trailer."); Pl.'s L.R. 56(a)2 Stmt. at ¶ 28 ("Denied, that Joseph Cunningham 'asked' [Veilleux] to assist him in unloading the aerial lift from the trailer. Whether it was a 'request' or a 'directive' based upon the instruction to [Veilleux] by his boss to assist the driver is a question of fact.").) This task required Veilleux "to get into the bucket of the aerial lift"; "when he was in the bucket, Joseph Cunningham raised the trailer portion of the flatbed trailer and, at that time, the chain securing the aerial lift broke and the lift rolled off the trailer and crashed into a building adjacent to the GDS premises." (Def's L.R. 56(a)1 Stmt. at ¶¶ 29-30; Pl.'s L.R. 56(a)2 Stmt. at ¶¶ 29-30.) According to Veilleux's complaint, this resulted in him being "pinned between the bucket of the lift and the wall and sustain[ing] severe injuries." (Def's L.R. 56(a)1 Stmt. at ¶ 31; Pl.'s L.R. 56(a)2 Stmt. at ¶ 31.)

"On or about November 27, 2007, Louis N. George, Esq. of Hassett & George, P.C., sent a letter to Howland & Sargent" inquiring as to coverage for "Central Auto & Transport, LLC and its related entities." (Def's L.R. 56(a)1 Stmt. at ¶ 35; Pl.'s L.R. 56(a)2 Stmt. at ¶ 35; ECF No. 83-5 at 77 ("George Letter")) The "Howland & Sargent Group sent a Memo to [Progressive] (the 'Howland Memo')" containing the letter on December 5, 2007. (Def's L.R. 56(a)1 Stmt. at ¶ 36; Pl.'s L.R. 56(a)2 Stmt. at ¶ 36.) "On December 10, 2007, Margaret Bertone of Progressive sent a letter to Central Rigging regarding a possible claim under [Policy 2] arising from the September 8, 2006 incident involving [Veilleux.]." (Def's L.R. 56(a)1 Stmt. at ¶ 37; Pl.'s L.R. 56(a)2 Stmt. at ¶ 37.)[2] On that same day, she also "sent a letter to Attorney Steve McEleney regarding a possible claim under [Policy 2] arising from the September 8, 2006 incident involving [Veilleux]." (Def's L.R. 56(a)1 Stmt. at ¶ 38; Pl.'s L.R. 56(a)2 Stmt. at ¶ 38.) "On February 26, 2008, Lawrence D. Leeders of Progressive sent a letter to Attorney Louis George regarding a possible claim under [Policy 2] arising from the September 8, 2006 incident involving [Veilleux]." (Def's L.R. 56(a)1 Stmt. at ¶ 39; Pl.'s L.R. 56(a)2 Stmt. at ¶ 39.) A day later, Leeders "sent a letter to Tony Crane of Central Rigging regarding a possible claim under [Policy 2] arising from the September 8, 2006 incident . . . ." (Def's L.R. 56(a)1 Stmt. at ¶ 40; Pl.'s L.R. 56(a)2 Stmt. at ¶ 40.)

"On May 20, 2008, [Leeders] sent a letter to [Attorney George] regarding Progressive's coverage position with respect to any potential claims under [Policy 2]"; the letter denied coverage under Policy 2. (Def's L.R. 56(a)1 Stmt. at ¶ 41; Pl.'s L.R. 56(a)2 Stmt. at ¶ 41; ECF

---

[2] Veilleux objects that the letter concerns "a claim," not a "'possible claim,'" but otherwise admits the allegation. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 37.) He repeats this objection several times in reference to Progressive's factual assertions concerning this claim. I do not address these objections since they do not affect my ultimate ruling.

No. 83-5, Def.'s Ex. 21 ("Denial of Coverage Letter") at 4.) "On or about October 30, 2008, Progressive received a letter from [Attorney George] regarding a lawsuit filed by [Veilleux] against Central Rigging." (Def's L.R. 56(a)1 Stmt. at ¶ 42; Pl.'s L.R. 56(a)2 Stmt. at ¶ 42.) "On or about February 12, 2015, [Progressive] received a letter from John P. Clifford, Jr., Esq. regarding a claim against Central Auto under [Policy 1]." (Def's L.R. 56(a)1 Stmt. at ¶ 43; Pl.'s L.R. 56(a)2 Stmt. at ¶ 43.) On that same day, Progressive received another letter from Attorney Clifford "regarding a claim against Central Rigging under [Policy 2]." (Def's L.R. 56(a)1 Stmt. at ¶ 45; Pl.'s L.R. 56(a)2 Stmt. at ¶ 45.)

### B. Veilleux's Complaint

Veilleux makes the following allegations in his complaint. (*See* ECF No. 17-1 ("Complaint").) He alleges that he filed suit in Hartford Superior Court "[o]n or about September 3, 2008 . . . seeking recovery from [Central Auto and Central Rigging] for the severe, serious, and disabling injuries" he suffered. (*Id.* at Count 1, at ¶ 5[3].) On March 30, 2016, Veilleux entered into a stipulation with Central Auto and Central Rigging, "upon which judgment entered on said date, wherein [both companies] stipulated to liability for the injuries suffered by [Veilleux] as aforesaid, and to judgment in favor of [Veilleux] in the amount of Three Million Seven Hundred and Fifty Thousand Dollars ($3,750,000), plus costs." (*Id.* at Count One, at ¶ 6; *id.* at Count Five, at ¶ 7). Veilleux contends that Central Auto and Central Rigging were both insured for liability for such injuries by Progressive at the time of his accident, and that Progressive "neglected and/or refused to provide coverage" to Central Auto

---

[3] Since Veilleux includes all of his factual allegations in the counts set out in his complaint and restarts the numbering of his paragraphs with each count, I cite his factual allegations using the particular count under which they fall.

and Central Rigging despite its obligation to "insure and defend" them. (*Id.* at Count One, at ¶¶ 7-11; *id.* at Count Five, ¶¶ 7-11.)

Veilleux's claims against Progressive include the following: (i) a direct action under Conn. Gen. Stat. § 38a-321 against Progressive for the full amount of a $750,000 insurance policy provided to Central Auto; (ii) a common law claim for the same amount advanced under the assignment of rights from Central Auto to Veilleux; (iii) a common law claim for the same amount as a judgment creditor of Central Auto and/or as a third party beneficiary of the policy between Central Auto and Progressive; (iv) a claim for breach of the implied covenant of good faith and fair dealing on the basis of Progressive's failure to honor Central Auto's policy; (v) a direct action under Conn. Gen. Stat. § 38a-321 against Progressive for the full amount of a $1,000,000 insurance policy provided to Central Rigging; (vi) a common law claim for the same amount advanced under the assignment of rights from Central Rigging to Veilleux; and (vii) a claim for breach of the implied covenant of good faith and fair dealing on the basis of Progressive's failure to honor Central Rigging's policy. (*See generally id.*)

## III.    Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to

determine whether there is a genuine issue as to any material fact, the court is required to resolve

all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v.*

*Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

## IV.    Discussion

### A.    Claims Concerning Coverage

Conn. Gen. Stat. § 38a-321, otherwise known as the "direct action statute," *see Tucker v.*

*Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 13 (D. Conn. 2013), provides in relevant part as follows:

> Each insurance company which issues a policy to any person, firm or corporation,
> insuring against loss or damage on account of the bodily injury or death by accident of
> any person, or damage to the property of any person, for which loss or damage such
> person, firm or corporation is legally responsible, shall, whenever a loss occurs under
> such policy, become absolutely liable, and the payment of such loss shall not depend
> upon the satisfaction by the assured of a final judgment against him for loss, damage or
> death occasioned by such casualty. . . .  Upon the recovery of a final judgment against
> any person, firm or corporation by any person, including administrators or executors, for
> loss or damage on account of bodily injury or death or damage to property, if the
> defendant in such action was insured against such loss or damage at the time when the
> right of action arose and if such judgment is not satisfied within thirty days after the date
> when it was rendered, such judgment creditor shall be subrogated to all the rights of the
> defendant and shall have a right of action against the insurer to the same extent that the
> defendant in such action could have enforced his claim against such insurer had such
> defendant paid such judgment.

Conn. Gen. Stat. § 38a-321. A plaintiff must make three showings to set out a cause of action

under this statute: "(1) that the plaintiff has recovered a final judgment; (2) that the judgment is

against a person who was insured by the defendant against liability on it; and (3) that the

judgment remains unsatisfied." *Tucker*, 936 F. Supp. 2d at 8, quoting *Skut v. Hartford Accident*

*& Indemnity Co.*, 142 Conn. 388, 393 (1955).  If the judgment remains unsatisfied "for more

than 30 days, the injured party is subrogated to the rights of the insured defendant and may

proceed with the action to the same extent that the defendant could have enforced his claim

against the insurer." *Id.*  In its motion for summary judgment, Progressive contends that neither

Policy 1 nor Policy 2 provide coverage for Veilleux's judgment against Central Auto and Central Rigging. (*See* ECF No. 81 at 1-2.)

An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . ." *Connecticut Medical Ins. Co. v. Kulikowski*, 286 Conn. 1, 5 (2008) (internal quotation marks omitted). Thus, "[t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy . . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning." *Id.* (internal quotation marks omitted). "When interpreting [an insurance policy], [a court] must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *Johnson v. Connecticut Ins. Guar. Ass'n*, 302 Conn. 639, 643 (2011) (internal quotation marks omitted). "In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Id.* An insurance policy "is ambiguous when it is reasonably susceptible to more than one reading." *Id.* In such circumstances, "any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy." *Id.* at 643 (internal quotation marks omitted).

Progressive makes several arguments in favor of its contention that neither of its Policies cover Veilleux's claim against Central Auto and Central Rigging. I address each of these arguments in turn.

### 1.     The Applicability of the Motor Carrier Act Endorsement

The parties dispute whether the Motor Carrier Act Endorsement ("MCS-90 endorsement") provides coverage for Veilleux's claim against Central Auto under Policy 1.  In 1980, Congress enacted the Motor Carrier Act ("MCA"), which, among other things, directed the "Secretary of Transportation [to] prescribe regulations [requiring] minimum levels of financial responsibility" for motor carriers engaged in interstate commerce "sufficient to satisfy liability amounts established by the Secretary covering public liability, property damage, and environmental restoration . . . ."  49 U.S.C. § 31139(b).  "Such financial responsibility could be established by evidence of insurance . . . reflected in an insurance policy endorsement on 'Form MCS-90B' . . . ."  *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 53 (2d Cir. 2012) (citing 49 C.F.R. § 387.31(d)(1)).  The parties are in agreement that Policy 1 contains an MCS-90 endorsement in satisfaction of Progressive's obligations under the MCA.  (*See* Def's L.R. 56(a)1 Stmt. at ¶ 4; Pl.'s L.R. 56(a)2 Stmt. at ¶ 4; ECF No. 83-1 at 16 (the MCS-90 endorsement).)  The parties' sole dispute is whether the MCS-90 could apply to the incident in this case, which both parties agree took place as a result of intrastate travel.  (*Compare* ECF No. 82 at 15 (arguing that MCS-90 endorsement does not cover intrastate trips) *with* ECF No. 86 at 12-16 (conceding trip that resulted in Veilleux's injuries involved only intrastate travel but arguing that MCS-90 endorsement applied anyway).)

As noted above, the MCA requires only those carriers engaged in *interstate* commerce to demonstrate the "financial responsibility" encapsulated in the MCS-90 endorsement.  *See* 49 U.S.C. § 31139(b); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 58 (2d Cir. 2012) (discussing the "requisite interstate nexus" for the application of the MCS-90 endorsement).  The majority of courts, including the Second Circuit and the Connecticut Supreme Court, apply a "trip-specific

approach" to determine whether this "requisite interstate nexus" exists in a case—i.e., they look

to see if the specific trip that resulted in the loss at issue was interstate in nature. *See Lyons*, 681

F.3d at 60 (rejecting coverage claim under MCS-90 on basis that trip that resulted in loss was

entirely intrastate in nature); *Martinez v. Empire Fire & Marine Ins. Co.*, 322 Conn. 47, 59, 62

(2016) (adopting the "trip-specific approach" used by the Second Circuit in *Lyons* and listing

cases from other Circuits adopting the same approach). Here, as noted, the parties agree that the

trip resulting in Veilleux's injuries was intrastate.

This does not resolve the matter, however, as there remains the question of whether

Connecticut law has expanded coverage under the MCS-90 endorsement. In *Martinez*, the

Connecticut Supreme Court noted that "although the 'trip-specific' interpretation limits the

application of federally mandated insurance coverage to trips that are interstate in nature, the

states nevertheless remain free to create their own regulations governing insurance requirements

for motor carrier transportation within their state borders." *See Martinez*, 322 Conn. at 63 (citing

Thomas Hershewe, Hiding in Plain Sight, Trial, February 2015, at 46, 48). The *Martinez* court

went on to note that "Connecticut has adopted regulations that generally mirror the federal

regulations and that apply to motor carriers engaging in intrastate travel." *Id.* (citing Con.

Agencies Regs. § 14-163c-1 *et seq.*). The cited regulations adopt portions of the MCA,

including the "financial responsibility" provision noted above, "as regulations of the Department

of Motor Vehicles." *See* Conn. Agencies Regs. 14-163c-1 (adopting "Part 387 [of the MCA],

Minimum Levels of Financial Responsibility for Motor Carriers"); *see also Chmura v.*

*Connecticut Dep't of Motor Vehicles*, No. CV084020932S, 2010 WL 6496184, at *3 (Conn.

Super. Ct. Aug. 31, 2010) ("Pursuant to Regulation § 14-163c-1, parts of the Code of Federal

Regulations, were incorporated by reference as regulations of the [Department of Motor Vehicles] . . . .").

Connecticut regulations in turn apply the federal regulations, including the MCS-90 endorsement, to "[a]ny motor vehicle in *intrastate* commerce that has a gross vehicle weight rating, or gross combination rating, or gross vehicle or gross combination weight, of eighteen thousand one (18,001) or more pounds . . . ." *See* Conn. Agencies Regs. 14-163c-2 (emphasis added) (noting that the "regulations adopted in accordance with [Conn. Agencies Regs. 14-163-1] shall apply to [various categories of vehicles]"); Conn. Gen. Stat. § 14-163c(a) (authorizing the Commissioner of Motor Vehicles to adopt regulations incorporating federal regulations, including the one specifying the MCS-90 endorsement, and to make them applicable to certain motor vehicles or carriers "in intrastate commerce"); Thomas Hershewe, Hiding in Plain Sight, Trial, February 2015, at 46, 48-49 (noting that some states, including Connecticut, have adopted the federal motor carrier regulations—including the MCS-90 endorsement—into state law and that "[b]y virtue of the state's incorporation, . . . intrastate vehicle[s] [are] subject to the financial responsibility requirements, and the MCS-90 should apply"). Thus, although the federal regulations permitting use of the MCS-90 apply only to interstate travel, the State of Connecticut has expanded liability under the MCS-90 to certain types of intrastate travel.

Progressive argues that "it is irrelevant that the State of Connecticut, in promulgating state regulations regarding intrastate commerce, has adopted certain sections of the Code of Federal Regulations" and that this legislation "does not preempt or otherwise alter the *federal* minimum levels of financial responsibility," including the MCS-90 endorsement. (*See* ECF No. 88 at 2.) This argument misses the mark. While Progressive is correct that Connecticut's regulations do not alter the federal minimum level of coverage provided by the MCS-90

endorsement, the regulations do alter the level of protection afforded under *state* law. Thus, even if the MCS-90 endorsement does not apply to intrastate travel as a matter of federal law, it does apply to certain types of intrastate travel under Connecticut law. Progressive also argues that the *Martinez* court suggested otherwise, noting that the court stated, "we observe that, although the 'trip-specific' interpretation *limits the application of federally mandated insurance coverage to trips that are interstate in nature*, the states nevertheless remain free to create their own regulation governing insurance requirements for motor carrier transportation within their state borders." (*See* ECF No. 88 at 3 (emphasis in original) (citing *Martinez*, 322 Conn. at 63).) This argument, like Progressive's previous argument, misses the fact that Connecticut has adopted the federally mandated insurance coverage of the MCS-90 and expanded it to certain intrastate carriers. Thus, the MCS-90 endorsement applies to certain categories of intrastate travel as a matter of Connecticut state law.

Veilleux asserts in his Local Rule 56(a) Statement that the tractor involved in this case weighed more than 18,001 pounds. (*See* Pl.'s L.R. 56(a)2 Stmt. at ¶ 7 ("The 1988 Volvo Aero tractor . . . is a vehicle with an unladen weight of 18,500 pounds . . . .").) If so, that would make the MCS-90 applicable to this case. Progressive is therefore not entitled to summary judgment on its claim that the MCS-90 does not apply.

### 2. The Applicability of the Hired Auto Coverage Endorsement

The parties disagree on whether the so-called "Hired Auto Coverage Endorsement" could provide coverage for Veilleux's claims under Policy 2. The Hired Auto Coverage Endorsement contained in Policy 2 provides, in relevant part, as follows:

> Except as specifically modified in this endorsement, all provisions of the Commercial Auto Policy Apply. We agree with you that the insurance provided under your Commercial Auto Policy is modified as follows:

. . .

When used in this Endorsement, whether in the singular, plural, or possessive:
1. "Hired auto" means an auto you lease, hire, rent or borrow.  This does not include any auto you lease, hire, rent or borrow from any of your employees, partners (if you are a partnership), members (if you are a limited liability company) or member of their households.

. . .

When used in Part I – Liability to Others, the definition of insured auto is amended to include hired auto.

. . .

The premium for this Hired Auto Coverage is based on the cost of hire, and is subject to a minimum cost of hire as listed below.  We may audit the cost of hire and charge appropriately for additional premium for up to three (3) years after the policy expiration.

(ECF No. 83-1 at 70 ("Hired Auto Coverage Endorsement") (internal emphases omitted).)

Progressive advances several arguments in favor of the contention that the Hired Auto Coverage Endorsement cannot apply to Veilleux's claims.

First, it argues that Central Auto, Central Rigging, and Central Construction acted together as a partnership.  (ECF No. 82 at 22.)  The existence of such a partnership, it contends, would foreclose coverage under the Hired Auto Coverage Endorsement because the vehicles that caused Veilleux's injuries were procured by Central Rigging from Central Auto (*see* ECF No. 86 at 21-22 (Veilleux concedes that "Central Rigging hired, rented, or borrowed the Aero Tractor and Landoll Trailer from Central Auto")).  The language of Policy 2, however, undercuts Progressive's argument.  The terms "[y]ou," "your," and "yours" in Policy 2 are defined as "the named insured shown on the Declarations Page" of the policy.  (*See* ECF No. 83-1 at 81.)  The Declarations Page lists the named insured as "Central Rigging & Trans."  (*See id.* at 69.)  Thus, for all intents and purposes, the Hired Auto Coverage Endorsement reads as follows: "'Hired

auto' means an auto [Central Rigging] lease[s], hire[s], rent[s] or borrow[s]. This does not include any auto [Central Rigging] lease[s], hire[s], rent[s] or borrow[s] from any of [its] employees, partners (if [Central Rigging] [is] a partnership), members (if [Central Rigging is] a limited liability company) or member of their households." (Hired Auto Coverage Endorsement.) Read literally, this provision forecloses coverage only if Central Rigging *itself* is a partnership—something even Progressive does not claim—and borrows an auto from *its* partner. While Progressive's alternative reading—that coverage is foreclosed if Central Rigging is a partner in a partnership—may also be reasonable, that would, at best, make the provision ambiguous. In either event, since all ambiguities must be construed against Progressive, *see Johnson*, 302 Conn. at 643, Progressive's argument fails.

Progressive also contends that the Hired Auto Coverage Endorsement does not apply because Robert Greco is the sole member of Central Auto and Central Rigging; to the extent any auto "was borrowed," Progressive contends, "it was clearly borrowed by the members of the limited liability company." (*See* ECF No. 88 at 8-9.) This argument misses the mark for several reasons. First, Progressive waived this argument by raising it for the first time in its reply brief. *See ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 97 n.12 (2d Cir. 2007) ("We decline to consider an argument raised for the first time in a reply brief."). Second, the provision Progressive cites forecloses coverage only for autos leased, hired, rented, or borrowed *by* the limited liability company *from* its members. It does not preclude coverage for autos procured by a limited liability company's members. Third, the record shows that Central Rigging did not obtain the equipment at issue in this case from Robert Greco but rather from Central Auto. Progressive has presented no evidence that Central Rigging obtained the equipment from Greco personally.

Finally, Progressive contends that Veilleux's claim fails because the equipment at issue did not meet the $5,000 "Minimum cost of hire" provision of the Hired Auto Coverage Endorsement. (*See* ECF No. 82 at 23.) This argument misconstrues the language of the policy. As demonstrated by the language quoted above, the "cost of hire" section of the Hired Auto Coverage Endorsement does not regulate coverage but rather the amount of premium to be paid for such coverage. (*See* Hired Auto Coverage Endorsement ("The *premium* for this Hired Auto Coverage is based on the *cost of hire*, and is subject to a minimum cost of hire as listed below." (emphasis added).) This understanding is confirmed by the fact that the Hired Auto Coverage Endorsement defines "hired auto" as, amongst other things, an "auto you . . . borrow." (Hired Auto Coverage Endorsement.)

For these reasons, I conclude there is at least a genuine issue of material fact concerning whether the Hired Auto Coverage Endorsement provides coverage for Veilleux's claims under Policy 2.

### 3.     Notice Requirement

Progressive contends that Veilleux's claims under both policies are barred due to Central Auto's and Central Rigging's failure to provide timely notice of a claim under the policies. (*See* ECF No. 82 at 17.) Both Policy 1 and Policy 2 contain the following provision noting the insured's duties under the policies:

> **<u>YOUR DUTIES IN THE EVENT OF AN ACCIDENT, CLAIM, LOSS OR SUIT</u>**
>
> **Notify Us As Soon As Practicable After An Accident Or Loss**
>
> If an insured or insured auto is involved in an accident or loss for which this Insurance may apply, the accident or loss must be reported to us as soon as practicable by calling claims service, even if the insured is not at fault.

(ECF No. 83-1 at 22 (Policy 1) (some emphases omitted); ECF No. 83-1 at 76 (Policy 2) (some emphases omitted).) Under Connecticut law, two conditions must "be satisfied before an insurer's duties can be discharged pursuant to the 'notice' provision of a policy: (1) an unexcused, unreasonable delay in notification by the insured; and (2) resulting material prejudice to the insurer." *Arrowood Indem. Co. v. King*, 304 Conn. 179, 198 (2012) (quoting *Arrowood Indem. Co. v. King*, 605 F.3d 62, 77 (2d Cir. 2010)). The burden of proving material prejudice falls upon the insurer. *See id.* at 201 ("[W]e hold that the insurer bears the burden of proving, by a preponderance of evidence, that it has been prejudiced by the insured's failure to comply with a notice provision."). "In determining whether a delay in notification is unreasonable and, thereby, untimely, a court must remain cognizant that an insured's duty to give notice does not arise unless and until facts develop which would suggest to a person of ordinary and reasonable prudence that liability may have been incurred, and is complied with if notice is given within a reasonable time after the situation so assumes an aspect suggestive of a possible claim for damages." *Arrowood*, 605 F.3d at 77.

Here, the parties dispute when notice of Veilleux's accident was provided to Progressive. As noted above, they do not dispute that Attorney Louis George sent a letter to Howland & Sargent, the insurance agent, on November 27, 2007. (Def's L.R. 56(a)1 Stmt. at ¶ 35; Pl.'s L.R. 56(a)2 Stmt. at ¶ 35.) The letter, which had a subject heading of "Progressive Insurance" and listed the policy number for Policy 2, stated as follows:

> Please be advised that this law firm represents the interests of Central Auto & Transport, LLC and its related entities. It is our understanding that you are the insurance agent procuring the insurance for these entities for all pertinent times. On September 8, 2006, there was an accident which occurred on the Berlin Turnpike, Berlin, Connecticut. The injured party was Eric Veilleux. Although Nationwide Insurance has been involved in adjusting this claim, they are now requesting copies of any and all insurance policies with regard to the related entities

to determine whether there may be additional coverage.  This is an important step in that any additional coverage would help to protect our mutual client.

(George Letter.)  The "Howland & Sargent Group sent a Memo to [Progressive] . . . containing the letter on December 5, 2007.  (Def's L.R. 56(a)1 Stmt. at ¶ 36; Pl.'s L.R. 56(a)2 Stmt. at ¶ 36.)  Thus, Progressive had notice of a potential claim under Policy 2 at that time.  This conclusion is supported by Progressive's subsequent transfer of the matter to a "Commercial Casualty Specialist" and a letter from said specialist dated December 10, 2007 to Central Rigging identifying the matter with a "Claim Number." (*See* ECF No. 83-5 at 81.)[4] The parties dispute whether Attorney George's letter provided notice to Progressive of a potential claim by Central Auto under Policy 1.

For the following reasons, I conclude there is a genuine issue of material fact concerning whether the letter provided notice to Progressive of a potential claim by Central Auto under Policy 1.  First, as noted above, the letter notes that Attorney George's "law firm represents the interests of *Central Auto & Transport, LLC* and its related entities, and asks for "copies of *any and all insurance policies with regard to the related entities* to determine whether there may be additional coverage."  (George Letter (emphasis added).)  Thus, the letter implies that Attorney

---

[4]  Progressive contends that George's letter in question "merely identified [Policy 2], indicated there was a claim pending being adjusted by [another insurance company] and requested a copy of [Policy 2]"; as such, it contends that the letter "did not state that a claim was being made under [Policy 2]."  (ECF No. 82 at 20.)   This argument is undermined by the information listed above.  In any event, any doubt on the matter is removed by Progressive's Denial of Coverage Letter to Attorney George, which notes that "[o]n December 5, 2005, Progressive received your correspondence, dated November 27, 2007 . . . advis[ing] the agent that there was [an] accident that occurred on September 8, 2006 in Berlin, Connecticut, from which Eric [Veilleux] was seriously injured."  (*See* Denial of Coverage Letter at 4.)  I presume that the "2005" date is a typo and that the author of the letter meant to write "December, 2007" instead.  In any event, the letter undermines any contention that Attorney George's November 27, 2007 letter failed to apprise Progressive of any claim against the company resulting from Veilleux's accident.

George was inquiring into the existence of insurance policies for all of the Central Group entities, including Central Auto. Second, there are contemporaneous notations contained in the record from Progressive's claims agents dating from the time of the receipt of the George letter noting an awareness that Central Auto was involved in Veilleux's accident and that it may have incurred liability. (*See* ECF No. 87-1 at 24 (December 5, 2007 notation from Progressive claims agent Emily R. Wilmes stating that "Central Auto owns [vehicle] involved" in the accident), 26 (December 6, 2007 notation from Wilmes stating "[letter] . . . from Central Auto's [attorney] putting us on notice as [possible] excess carrier"), 33 (February 25, 2008 notation from Progressive claims agent Lawrence Leeders stating: "Action Plan: 1. F/U [with] [attorney] for Central Auto & Transfer: get status of any claims"), 34 (February 27, 2008 notation from Leeders mentioning Attorney George's discussion of "the contention against primarily [Central Auto]").) These factors, when construed in Veilleux's favor, support the notion that George's letter provided Progressive with knowledge that "would suggest to a person of ordinary and reasonably prudence that liability may have been incurred" on behalf of Central Auto. *Arrowood*, 605 F.3d at 77.

Progressive contends that the fourteen month lag period between Veilleux's accident and George's letter did not constitute reasonable notice. Even if that is true, however, Progressive has failed to demonstrate a lack of a genuine dispute of material fact regarding whether it was materially prejudiced by any unreasonably delay in providing notice. Progressive contends it was prejudiced by Veilleux's alleged lack of timely notice in the following ways: (1) it did not get a chance to investigate the accident scene; (2) "Mr. Cunningham had already given a statement concerning the accident"; (3) "the tractor and the trailer involved in the accident were

no longer available for any reasonable inspection; and (4) "Mr. Veilleux had gone through extensive medical treatment." (ECF No. 82 at 20.)[5]

None of these arguments warrants granting Progressive judgment as a matter of law. First, Progressive was able to purchase the police report documenting the accident, which contained a total of eight pages and forty-nine photographs of the scene. (*See* ECF No. 87-1 at 27 (December 6, 2007 notation from Wilmes noting that the police report was eight pages long and contained forty-nine photographs).) Progressive does not explain how its own investigation would have materially improved upon such a report. Second, Progressive does not explain how Mr. Cunningham's statement would have meaningfully differed had Progressive had earlier notice of its potential liability. Third, Progressive fails to present any evidence that it did not have access to the equipment that caused Veilleux's injuries at the time of the George letter. Since Progressive bears the burden of demonstrating prejudice, this failure undermines its argument on this point. Finally, it is unclear what the relevance of Veilleux's medical treatment is to Progressive's argument—presumably, Veilleux's medical treatment would not have differed had Progressive received earlier notice of its potential liability.

Most significantly, Progressive fails to explain how its actions would have materially differed had it received notice earlier. It denied Central Rigging's claim on the basis that the equipment that caused the accident was not covered by Policy 2. Progressive makes a similar argument in its motion for summary judgment with respect to coverage under Policy 1. Given that most of these arguments do not in any way rely upon the details of Veilleux's accident, they

---

[5] Progressive added in its reply brief that it was particularly prejudiced under Policy 1 given that the "underlying state court action had already been litigated for six (6) years and five (5) months" by the time it received notice of a potential claim under the policy. (ECF No. 88 at 8.) My conclusion that there is a genuine issue of material fact concerning whether Progressive received notice of a potential claim under Policy 1 via the George letter moots this point.

do not suggest that Progressive would have benefitted from conducting an earlier investigation of the claim. Further, Progressive does not point to any indeterminate facets of the accident that an earlier investigation could have determined to its benefit. For example, Progressive does not suggest that the issue of fault was unclear or that any of the details of the accident were in dispute. Finally, the record demonstrates that Progressive received notice of Veilleux's lawsuit against Central Rigging on October 30, 2008, and declined to provide a defense. (*See* ECF No. 83-5 at 96 (October 30, 2008 letter from Attorney George noting that Veilleux had filed suit against Central Rigging and requesting a defense).) Further, Progressive received a similar request for a defense and indemnification from Central Auto approximately nine months before the scheduled trial date, and apparently failed to respond—at the very least, the record does not contain any such response. (*See* ECF No. 83-5 at 98 (February 12, 2015 letter from Attorney Clifford, Jr. noting that Veilleux's case against Central Auto was scheduled for trial on November 17, 2015 and requesting a defense and indemnification).) Thus, Progressive had a chance to defend its insureds in the litigation against Veilleux but chose not to. As such, there is a genuine issue of material fact regarding whether Progressive was materially prejudiced by the timing of the notice it received of Veilleux's accident.

### 4. Other Grounds For Denial of Coverage

Progressive presents several other potential grounds for denial of coverage that require only brief mention. I address these grounds in turn.

#### a) Voluntary Payment Clauses

Progressive contends that the "Voluntary Payment Clauses" present in both policies preclude coverage. The clauses state as follows:

**<u>YOUR DUTIES IN THE EVENT OF AN ACCIDENT, CLAIM, LOSS OR SUIT</u>**

* * *

You and any person or organization claiming coverage as an insured must:

- assume no obligation, make no payment, or incur no expense without our consent, except at the insured's own cost;

(ECF No. 83-1 at 22 (Policy 1) (some emphases omitted); ECF No. 83-1 at 76 (Policy 2) (some emphases omitted).) I conclude that Progressive has not shown that it is entitled to judgment as a matter of law as to this issue. As noted above, the direct action statute provides a cause of action predicated upon the following three elements: "(1) that the plaintiff has recovered a final judgment; (2) that the judgment is against a person who was insured by the defendant against liability on it; and (3) that the judgment remains unsatisfied." *Tucker*, 936 F. Supp. 2d at 8-9 (internal quotation marks omitted). Progressive's suggested application of the "Voluntary Payment Clauses" would effectively vitiate such an action by allowing an insurer to refuse improperly to defend its insured and then elude liability for a subsequent judgment against the insured on the basis of lack of consent. This application would defy the Connecticut Supreme Court's edict that an insurer that wrongfully refuses to defend its insured cannot avail itself of the other portions of its policy in avoidance of its indemnity obligations. *See Missionaries of Co. of Mary v. Aetna Cas. & Sur. Co.*, 155 Conn. 104, 114 (1967) ("The defendant, after breaking the contract by its unqualified refusal to defend, should not thereafter be permitted to seek the protection of that contract in avoidance of its indemnity provisions.").

The Connecticut Superior Court's decision in *Soria v. Necatera*, No. FSTCV136017134S, 2015 WL 9911485 (Conn. Super. Ct. Dec. 29, 2015) is instructive on this point. *Soria* concerned an insured's attempt to recover the cost of a de facto settlement[6] from an

_____

[6] The insured in *Soria* faced a demand for various damages backed up with a threat of withholding of payments for other work performed by the insured; the insured paid the amount

insurer that had refused to defend the insured.  *See id. at \*1-2.*  The insurer argued that the following clause in the insured's policy foreclosed coverage: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for the first aid, without consent."  *Id.* at \*7.  The *Soria* court rejected this argument, noting that such an argument would imply that a "court should accept the circular or bootstrap argument that if an insured pays a claim *after* the carrier denies coverage for the claim, that that payment itself justifies the carrier's denial of the claim . . . ."  *Id.* at \*8.  The court concluded instead that "[o]nce there is a total denial of the claim (duty to defend and indemnify), and assuming that the denial were otherwise wrongful (as been claimed by the plaintiffs), the plaintiffs would have a valid and viable claim against the carrier for the amount of any reasonable settlement."  *Id.*  Thus, "the voluntary payment provision necessarily loses essentially all of its potential applicability, once the claim has been denied."  *Id.*

This reasoning is directly applicable to the present case.  There is no dispute that Central Auto and Central Rigging entered into their settlement with Veilleux *after* Progressive denied coverage under both policies.  (*See* ECF No. 83-5 at 18 (Stipulated Judgment between Veilleux, Central Rigging, and Central Auto dated March 30, 2016).)  As such, assuming Progressive's denial of coverage was wrongful, the Voluntary Payment Clauses are unenforceable.  Progressive cites extensively to the Connecticut Supreme Court's decision in *Interface Flooring Sys., Inc. v. Aetna Cas. & Sur. Co.*, 261 Conn. 601, 604 (2002).  (*See* ECF No. 82 at 28-31.)  In *Interface*, the Connecticut Supreme Court held, applying Georgia law, that a voluntary payment clause similar to the ones at issue here absolved an insurer from reimbursing its insured for

---

demanded rather than risk losing the payments after the insurer refused to defend.  *Soria*, 2015 WL 9911485 at \*2.

expenses the insured incurred before notifying the insurer of the lawsuit.  *See id.* at 615-16.  As

the *Soria* court noted, however, this decision—even if it reflected Connecticut law—applies only

to pre-tender expenses.  *See Soria*, 2015 WL 9911485 at *7 ("The issue in *Interface* and related

cases is the liability of an insurer for *pre-tender* expenses incurred by the insured. . . .  Thus, the

Supreme Court's discussion of other cases . . . recognized a distinction between expenses

incurred prior to tender of the defense (notice of the claim) and expenses that were incurred after

the tender.").  The expenses at issue in this case occurred *after* notice was tendered to

Progressive of the potential claims under both policies.  As noted above, Progressive declined

coverage at that time.  Thus, *Interface* does not move the needle for Progressive.

### b)      The Suit Against Us Provisions

Progressive argues that the "Suit Against Us" provisions of the policies foreclose

coverage.  (ECF No. 82 at 32.)  These provisions provide as follows:

**5. Suit Against Us.**

> We may not be sued unless there is full compliance by you or an insured
> with all of the terms of this policy.  We may not be sued under PART I –
> LIABILITY TO OTHERS until the obligation of an insured to pay is finally
> determined by judgment against that insured after actual trial or by written
> agreement of the insured, the claimant, and us.

(ECF No. 83-1 at 41 (Policy 1) (some emphases omitted); ECF No. 83-1 at 95 (Policy 2) (some

emphases omitted).)  As with the "Voluntary Payment Clauses," the "Suit Against Us"

provisions fly in the face of the direct action statute and the Connecticut Supreme Court's

precedent holding that an insurer that wrongfully refuses to defend its insured may not shirk its

indemnity obligations by relying upon other portions of the policy.  *See Missionaries*, 155 Conn.

at 114.  If Progressive wrongfully failed to defend its insureds in this case, it cannot then refuse

to pay their subsequent settlement on the basis that it did not consent to said settlement.[7]

### c)       Contractual Liability Provisions

Progressive avers that the "Contractual Liability Provisions" in the policies preclude

coverage.  The "Contractual Liability Provisions" provide, in relevant part, that Progressive's

duty to defend does not include:

> Any liability assumed by an insured under any contract or agreement, unless the
> agreement is an insured contract that was executed prior to the occurrence of any
> bodily injury or property damage.  However, this exclusion does not apply to
> liability for damages that an insured would have in the absence of the contract or
> agreement.

(ECF No. 83-1 at 30 (Policy 1) (emphases omitted); ECF No. 83-1 at 84 (Policy 2)

(emphases omitted).)  This provision does not dispel any genuine issue of material fact

concerning coverage.  As an initial matter, the provision does not preclude coverage on its face,

---

[7] Progressive cites, albeit indirectly through a citation to a Connecticut Superior Court
case, a Connecticut Insurance Department regulation providing that an insurance policy "may
contain in substance the following conditions: . . . a provision that no action shall lie against the
insurer until all the terms of the policy have been complied with or, under the liability coverage,
until the amount of the insured's obligation to pay shall have been finally determined either by
judgment against the insured after actual trial or by written agreement of the insured, the
claimant and the insurer, and a further provision that the insurer shall not be joined or impleaded
in any action against the insured brought to determine his liability."   Connecticut Insurance
Regulations § 38–334–8(b)(1)(E) ("Regulation 8(b)(1)(E)").  The very case that Progressive cites
undermines its argument.  (*See* ECF No. 82 at 33 (citing *Shaw v. Geico Gen. Ins. Co.*, No.
AANCV156019614S, 2016 WL 4203044, at *8 (Conn. Super. Ct. July 7, 2016)).)  In *Shaw*, an
insurer argued that Regulation 8(b)(1)(E) foreclosed an insured's suit against it because the
insurance policy at issue contained the type of clause described in that regulation.  *Id.* at *8.  The
*Shaw* court rejected that contention, noting that "[t]his regulation merely states that such a
provision may be added to automobile insurance policies."  *Id.*  "By placing the 'condition of
suit' provision in its policy, [the insurer] has done what the regulation has authorized.  That
provision may now be interpreted and applied under the contract law of this state.  That law is
controlled by the Supreme Court[]. . . ."  *Id.*  Here, Progressive undoubtedly had authorization to
use the "Suit Against Us" provisions in its policies.  The interpretation of these policies,
however, is governed by the Connecticut Supreme Court's decision in *Missionaries*.  As such,
Progressive's citation to Regulation 8(b)(1)(E) does not help its argument.

as there is a genuine issue of material fact regarding whether Central Auto and Central Rigging would have incurred the damages allotted in the settlement "in the absence of the contract or agreement"—i.e., if they had gone to trial. Second, the use of the term "contract or agreement" in the provision does not unambiguously include a settlement—let alone one entered as a stipulated judgment of the court.

Even if the provision did nominally preclude coverage, however, it would not help Progressive. As noted above, Connecticut law provides an insured with a right to collect from an insurer that wrongly refuses to defend it. An insurer that wrongly refuses to defend cannot "thereafter be permitted to seek the protection of [the policy] in avoidance of its indemnity provisions." *Missionaries*, 155 Conn. at 114. Here, Progressive is arguing that its insureds breached the policies by entering into the stipulated judgment *after* it wrongfully refused to defend them. *Missionaries* forecloses such an argument.

### d)    Movement of Property by Mechanical Device Exclusions

Progressive argues that Veilleux's claims are barred by the "Movement of Property by Mechanical Device" provisions of the policies. The provisions in question provide that coverage is precluded for:

> Bodily injury or property damage resulting from or caused by the movement of property by a mechanical device, other than a hand truck, not attached to an insured auto.

(ECF No. 83-1 at 31 (Policy 1) (emphases omitted); ECF No. 83-1 at 86 (Policy 2) (emphases omitted).) This provision does not apply in this case, however, as the record demonstrates that Veilleux alleged in the underlying action that the accident was caused by the rupture of a chain attached to the tractor-trailer driven by Cunningham. (*See* ECF No. 83-3 at 129, Veilleux's Amended Complaint against Central Auto and Central Rigging (alleging that the accident

occurred due to the breaking of the chain attached to the tractor-trailer).)  As noted above, there is a genuine issue of material fact concerning whether the policies at issue in this case provide coverage for these vehicles.  Thus, summary judgment under this provision cannot issue.

### e)  Handling of Property Exclusions

Progressive contends that the "Handling of Property" exclusions in the policies foreclose coverage.  (ECF No. 82 at 35-36.)  These provisions provide that Progressive does not cover claims for:

> Bodily injury or property damage resulting from or caused by the handling of property:
>
> a.  before it is moved from the place where is it is accepted by the insured for movement into or onto your insured auto; or
> b.  after it has been moved from your insured auto to the place where it is finally delivered by the insured.

(ECF No. 83-1 at 31 (Policy 1) (emphases omitted); ECF No. 83-1 at 86 (Policy 2) (omitted).)  In particular Progressive contends that the second portion of this provision applies.  (ECF No. 82 at 36.)  There is a genuine dispute of material fact, however, concerning whether the accident that caused Veilleux's injuries took place *after* the property to be delivered—i.e., the aerial lift— had been moved to the place where it was finally delivered.  As noted above, the accident allegedly occurred as Veilleux was helping unload the tractor.  Thus, there is a genuine dispute of material fact concerning whether the aerial lift had been taken "to the place where it [was] finally delivered by the insured" at the time the accident took place.

### f)  Operation of Certain Machinery or Equipment Exclusions

Progressive avers that the "Operation of Certain Machinery or Equipment" exclusions in the policies forestall coverage.  (ECF No. 82 at 36.)  Those provisions provide that Progressive will not cover claims for:

Bodily injury, property damage, or covered pollution cost or expense arising out of the operation of:

. . .

    a.   machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of mobile equipment if it were not subject to a compulsory or financial responsibility law where it is licensed or principally garaged.

(ECF No. 83-1 at 32 (Policy 1) (emphases omitted); ECF No. 83-1 at 86 (Policy 2) (emphases omitted).) Progressive contends that the "aerial lift involved in the subject accident would qualify as 'mobile equipment.'" (ECF No. 82 at 36.) There is a genuine dispute of material fact, however, regarding whether the accident occurred due to the operation of the "aerial lift" as opposed to the breaking of the chain attached to the tractor-trailer.

### g)      Two or More Policies Issued by Us Provisions

Progressive argues that coverage under at least one of the policies is precluded by the "Two or More Policies Issued by Us" provisions in the policies. These provisions provide as follows:

4        Two or More Policies Issued by Us

If any applicable insurance other than this policy is used to you by us, or any company affiliated with us, and applies to the same accident or loss, the total amount payable among all such policies shall not exceed the limits provided by the single policy with the highest limits of liability.

(ECF No. 83-1 at 41 (Policy 1) (emphases omitted); ECF No. 83-1 at 95 (Policy 2) (emphases omitted).) The policies in question, however, cover two different insureds—Central Auto and Central Rigging. Thus, this provision is inapplicable.

### B.     Punitive Damages

Progressive contends that even if it had a duty to defend or indemnify the claims at issue in this matter, it cannot be liable "for any punitive, exemplary or statutory multiple damages."

(ECF No. 82 at 38.)  In support of this contention, Progressive points to a policy provision in

both policies providing, in pertinent part, as follows:

> Subject to the Limits of Liability, if you pay the premium for liability coverage, we will pay damages, OTHER THAN PUNITIVE, EXEMPLARY, OR STATUTORY MULTIPLE DAMAGES, for bodily injury, property damage, and covered pollution cost or expense, for which an insured becomes legally responsible because of an accident arising out of the ownership, maintenance or use of that insured auto.  However, we will only pay for the covered pollution cost or expense if the same accident also caused bodily injury or property damage to which this insurance applies.

(ECF No. 83-1 at 27 (Policy 1) (some emphases omitted); ECF No. 83-1 at 81 (Policy 2) (some

emphases omitted).)  Nothing in Veilleux's complaint suggests, however, that he is seeking

coverage for punitive, exemplary or statutory multiple damages incurred by Central Auto and

Central Rigging.  Rather, his complaint suggests he is seeking compensatory damages up to the

policy limits, attorney's fees and costs incurred by Central Auto and Central Rigging in defense

of the underlying action against Veilleux, and punitive damages *against Progressive* for alleged

bad faith.  (*See* Complaint at 10 (seeking "1.  "[c]ompensatory damages in the form of the policy

limits as described in the Complaint; 2. [a]ttorney's fees and costs incurred by [Central Auto]

and [Central Rigging] in defense of the previous action brought by [Veilleux]; and 3. [p]unitive

[d]amages").)  Thus, Progressive's argument lacks merit.

### C.  Breach of the Covenant of Good Faith and Fair Dealing

Progressive argues that there is no evidence to support Veilleux's claims for breach of the

implied covenant of good faith and fair dealing.  (*See* ECF No. 82 at 39.)  "[T]he duty of good

faith and fair dealing is a covenant implied into a contract or a contractual relationship."

*Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 295 (D. Conn. 2017) (quoting *De La Concha*

*of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004)).  This duty "requir[es] that

neither party do anything that will injure the right of the other to receive the benefits of the

agreement." *Id.* To set out "a cognizable claim of breach of the implied covenant of good faith and fair dealing, [the plaintiff must allege that] 'the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract [were] taken in bad faith.'" *Calhoun v. Providence Mut. Fire Ins. Co.*, 204 F. Supp. 3d 436, 442 (D. Conn. 2016) (quoting *De La Concha of Hartford, Inc.*, 269 Conn. at 433). Bad faith encompasses "both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Habetz v. Condon*, 224 Conn. 231, 237 (1992), quoting Black's Law dictionary (5th ed. 1979). In essence, then, "[bad] faith means more than mere negligence, it involves a dishonest purpose." *De La Concha of Hartford, Inc.*, 269 Conn. at 433. Although an insurer's "failure to conduct an adequate investigation of a claim, when accompanied by other evidence, reflecting an improper motive, properly may be considered as evidence of bad faith," *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014), "[a]llegations of a mere coverage dispute or negligence by an insurer in conducting an investigation will not state a claim for bad faith against an insurer." *Martin v. American Equity Ins. Co.*, 185 F. Supp. 2d 162, 165 (D. Conn. 2002).

Progressive contends that Veilleux's breach of the covenant of good faith and fair dealing claims fails because Veilleux has failed to present any evidence of bad faith. (ECF No. 82 at 39.) Veilleux points to the following pieces of evidence in defense of his claim: (1) that Progressive knew in December 2007 that Central Auto owned one of the vehicles involved in the accident and was asked to locate Central Auto's insurance policy but did not; (2) that Progressive refused to respond to Attorney Clifford, Jr.'s letters in February 2015 inquiring about coverage for Central Rigging and Central Auto; (3) that Progressive knew that the Central Auto tractor had

the logo of "Central Rigging" on it as early as December 5, 2007; (4) that Progressive did not obtain the police report regarding Veilleux's accident until February 28, 2008; (5) that Progressive never sent anyone to investigate Central Rigging's claim before denying it on May 20, 2008; (6) that Progressive tried to convince Greco there was no coverage provided by Progressive for Central Rigging's loss before denying the claim; (7) that Progressive denied coverage under Policy 2 under the "hired auto" endorsement without any basis; and (8) that Progressive denied coverage under Policy 1 on the basis that the MCS-90 Endorsement did not apply "when Connecticut law provided otherwise." (*See* ECF No. 86 at 37-38.)

While almost all of Veilleux's claims suggest negligence rather than bad faith on the part of Progressive, the sixth allegation—that Progressive tried to convince Greco to agree that there was no coverage—gives rise to a genuine dispute of material fact concerning whether Progressive acted with bad faith. The evidence on this point consists of a notation made by Progressive employee Margaret F. Bertone, dated December 14, 2007, stating as follows: "Left another message for NI [attorney], Louis George . . . . Need to discuss as had gotten NI, Rob Greco to understand and agree that there is no coverage provided by Progressive, for this loss." While this notation is, admittedly, somewhat cryptic, it is clear enough, when construed in Veilleux's favor, to suggest that Progressive was attempting to pressure Greco into dropping Central Rigging's coverage claim outside the presence of his counsel. A reasonable juror could find that such an action constituted bad faith.

As such, I deny Progressive's motion for summary judgment with respect to Veilleux's bad faith claim.

## V.       Conclusion

For the reasons set forth above, Progressive's motion for summary judgment (ECF No. 81) is hereby DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                September 13, 2018